Are you ready for me to proceed? Well, let's wait till the hubbub kind of has calmed down of people coming and going. Okay, I'm sorry. I'm just trying to everybody needs to be seated if you're going to be listening to this argument please now at this time. Thank you. And you may proceed, sir. Mr. Collings. Good morning, your honors. Chadwick Collings on behalf of the defendants, same-time repair sheriff's deputies Kyle Hart and Ryan Morey. I have with me this morning my colleague Sarah Fisher who's making her first appearance before the court. I wanted to introduce her to you all. She's never been here in this wonderful building and we both thank you for allowing us to come here and present our argument today. So let me start by reminding the court of something that they probably are aware of. About 30 years ago, there was a movie called Tombstone. It was a western and in that movie, there's a kind of a funny anecdote where Wyatt Earp's character after the shootout of the O.K. Corral looks at the sheriff and says, I don't think I'm going to let you arrest me today and walks off. Now that's a work of fiction. It for law enforcement. The district court would rewrite how law enforcement makes valid arrests because what happened in this case is the two officers, my clients, tried to arrest Ms. Perkins who was arrested and convicted for resisting arrest. The issue of whether or not it was a valid arrest, whether she should or shouldn't have been arrested is closed under HECC. We don't get to talk about that. So we're assuming the arrest was valid and if you watch the videos, which are in evidence, there are three of them, if you watch those videos, you will see exactly what happened. Kyle Hart, Deputy Kyle Hart, tells Ms. Perkins, you're under arrest. Ms. Perkins walks away from him towards her home. He follows her up the immediately begins to resist. She turns, she fights, she starts screaming at him, calling him weak and laughing at him. At that point, the other deputy, Deputy Mooring, began to assist his fellow officer in getting this woman into custody. Now the district court, and my guess is the vast majority of people in this room, have probably never had to struggle with trying to put another human being, a grown healthy adult, into custody. Let me tell you something. There is no other tool on a police officer's tool belt that can do this any differently than what they did in this case. Counsel, so we get the videos, we've watched them, and I don't mean to interrupt your flow, but we're not here based on tombstone or wide earth. We're here on a very limited standard of review because under our precedent, the law, the district court denied summary judgment for your clients because of genuine issues of material fact. We cannot question the genuine issues of fact that the trial court found. We can only determine whether they were material, correct? I would think that is an accurate representation of the recitation of the law in the circuit. All right, so the district court, as I understood it, with regard to Ms. Perkins, found that at some point she was subdued. District court was open about her resisting, and the video shows people acting the way they acted, but at some point the district court says she was subdued. She's on the ground, and so there was a question of fact about whether one of the officers choked her or used excessive force once she was cut. I think that's correct. How do we get beyond what the district court found to be a genuine issue of fact? Well, fortunately, we have a video, and the court, the court's in this circuit. Well, the video shows the officer's hand on her neck. For about less than two seconds. Doesn't matter. The video shows her saying, why are you choking me? The audio shows that, and there's not exactly a clear line of sight. So the court, the district court found that that was a fact dispute, and we determined that that fact dispute is not material to the question of whether excessive force was used. That's what I'm asking you to do exactly. How do we do that? You simply look at the video and say, there's nothing here that is clearly objectionable, excessive. In our view, there isn't. Now, if we had been in a case where I think the district court said she was subdued, would it not be excessive force at that point for the officer to choke her? I think that's, I think that it flies in the face of the video. I think the district court viewed the video in her, and with her perspective, and it was, in our view, legally incorrect. Are you saying that the video does not show choking? Yes, it does not. It shows a moment in time when there's a struggle, where the hand is on the clavicle, but it was less than too safe. It is just, look, whenever you're fighting with someone on the ground, your hands are going to go all over the place. There was no, you know, I'm choking you out to try to get you under control. Well, the video does show that the plaintiff says that she was being choked. She could have said, you're shooting me. It doesn't mean she got shot. No, fair enough. That sounds like a fact dispute. No, we don't dispute that she said it, and we don't dispute that there was a hand on the clavicle. So the theory has to be that that was a lie, and that the video shows that that was a lie. Yes. Yeah, or at least an exaggeration, a clear exaggeration of you're choking me. Because if you're actually being choked, you're responsible for the answer. I wish you would let me actually finish my answer, because it actually could have been helpful to you. My question was going to, or if you'd let me finish my question, my question was going to be, are you saying that there wasn't choking? Or are you saying that the plaintiff hadn't been subdued at that time? Yes. They were still engaged in a struggle to get her under control and into custody. Okay. So that, I think, is at least a more persuasive argument than your earlier one. The question then becomes, why is choking necessary as part of this? Talk to me about that. That's what's generally referred to in the law enforcement world as a vascular restraint. Typically, that's not used. It's not taught in the academies, and that's not part of it. It would be a lethal force option that is rarely used. And meaning, why was that necessary? It wasn't. That's not a vascular restraint. A vascular restraint is an arm around someone's neck, and you're trying to basically choke them out, make them lose conscience. You're saying, hypothetically, that's... That's not what happened here? If you watch the video, no. What you see is a struggle. In fairness, the video on this point is a bit hard to follow. What you hear is a claim of choking, and you do see hands around the neck. If you watch both, there's one video where at that point in time, it is hard to see exactly what's happening. But if you watch the other video, which was, I believe, the nephew's video, which was the alter, it just kind of speeds up in time. If you watch that one, you can see that's not a choke. By definition, that's a simple two-second, my hand hits you right here. That's not a choke, all right? It never will... You can't kill someone in two seconds just because you put somebody's hand... And so you're saying the video is, in your mind, close enough to establish that it was the placement that you're describing, but not a choking? Absolutely. So then it brings us back to the other point about, she was not subdued, is the position that you have. If you watch the video... Yeah, and so just a second, just a second. Your position is she was not subdued, and you believe that that's manifestly clear from the videos. Yes. And that under the Supreme Court authority and Scott v. Harris, we can consider the videos no matter what the district court said, even on interlocutory appeal. But then that gets us to this case, this Edwards case. And they, for some reason in that case, they said that when you're quibbling on interlocutory appeal, you're not allowed to use the Riley v. Scott. But there are other cases that say you are. And so, I'm confused as to whether we can do that or not. Can we override, based upon the videos, the district court's conclusion that she was subdued, or are we not legally allowed to do so? That is a question in this case. The U.S. Supreme Court in Scott says you can't. And Judge Hogan, you were on the Edwards case, and you wrote the dissent. So you probably know better than anybody, your colleagues on Edwards got it wrong. But what do we do? But we don't get to just say our colleagues got it wrong. And I'm not saying that our colleagues got it wrong. I'm not pointing on that. Because we have this thing called rule of orderliness. So you have to tell me that there's an older case that did do this and that beats out this Edwards case. Or else the Edwards case doesn't apply in this context. Well, I think you've got a whole host of cases, and we list them in our briefs. Both the Supreme Court case in Scott, which I think Edwards is contrary to, frankly, and that's why they just got it wrong. But you have the Irwin case, the Kokesh case, the Buhler case, which was a great case for us. Irwin is the case we talked about in Edwards, right? Yes. Yeah, that's unpublished. It's unpublished. But you basically called out your colleagues saying, look, what we did in Irwin. All right, but that doesn't answer Judge O'Rourke. He was one vote. There were two votes that got away. We're bound by those two votes. But you've got Buhler. I lost fair and square. Well, you did. We all lose fair and square sometimes. But the fact is, you have the Buhler case from the same circuit, right? Which did exactly what we're asking you to do. Is Kokesh before Edwards? In time? Yes, because that's published. Yes, Kokesh is before Edwards, I think. I'm not positive, actually. Yeah, well, I'm going to take you right away. So no, I'm trying to figure out. Kokesh is 2021, and they absolutely used the video on interlocutory appeal. So I'm trying to figure out what case. So can you give us a published case that used the video before 2022 and said that was acceptable? Before 2022? Yeah, before 2022 when the Edwards case was decided. That's what I've been trying to research myself. And so it's your job to research this. We cited the ones we could find. I just listed them. I didn't write the years behind each one. Obviously, Scott predates that one, the Supreme Court case. It doesn't matter. Just so you understand, we don't get, when there are intervening cases from our court interpreting the Supreme Court, we have to follow those intervening cases from our court under the rule of orderliness, even if we thought those cases were wrong. Because we have a very middle management and we have a very strict rule of orderliness. And so that's so that we're not just every panel doing its own thing. There's a good principled reason for this rule of orderliness. But so that's why we have to see whether that case was out of order or if that case doesn't apply for some reason. That's because once, because there are these cases after the Supreme Court has spoken. If the Supreme Court came up with a new case, then we could say all bets are off. But that's not where we are in this. I'm sorry to take your time though to explain how it works. No, those are all great questions, Your Honor. And I would just tell you, I think you've got, that's brief, it's mentioned in one of our briefs, whether the original or the appellate. I'm trying to remember the name of the case. But this court has recently done that. You can bring it up during reply. I'm sorry? You can bring it up during your reply time. Can you go to whether about the son? I'm sorry? The son? Are you going to argue? DJ's case. Yes. Okay. So DJ was the minor. Or maybe he's not the son. I'm sorry, the minor. DJ is the plaintiff's son. That's my answer. Yeah, that's okay. Okay. So what happened there is, we talked about excessive force and the use of force with respect to Ms. Perkins. We also have the issue of the use of force and the First Amendment claims by DJ. Two separate claims, but I think both of them are essentially overruled by Buehler.  Your decision, and Buehler said, the right to film does not mean you have the right to interfere. We cited Buehler in our motion for summary judgment. Actually, I think it came out between filing a motion and the reply brief. So we cited that reply brief. But Buehler says, no, you don't have an unfettered right to just walk up to police officers and start filming them every time and whenever you feel like it. How is he interfering here? Because he was getting closer and closer to where these two officers are struggling on the ground. I mean, he stayed on the sidewalk and the officers and the mom were in the driveway. Within feet of each other. Where's your case that says where interference begins and where First Amendment ends? Fortunately for us, with respect to QI, it's their burden to show the case, okay? In our view, there is no clear controlling precedent that says you have a right to stand within five feet, six feet, three feet. There's Buehler says simply, you don't have a right to just walk up and start filming whenever you feel like it. And in view of the police officers, the reality is that is a very dangerous moment. When you have two law enforcement officers on the ground struggling with an individual and you have a family member walking up to them. This isn't some eight-year-old. This is a person of the same size. And when they walk up to them, they don't know if this person's got a gun, if they're going to try to join the fight, in which case their lives are not put at risk. They have an absolute right to control that scene and ask people to step away while they finish getting this person into custody. That's what they did. Now, if you want to say, well, there's no case that says where that line ends, well, then good. Then qualified immunity applies. Could you tell us whether or not there's a seizure here? TJ? Yeah, what is this? How does the Fourth Amendment kick in? Well, the plaintiff would suggest that the display of a non-lethal weapon, a taser, is the seizure. What case says that? The HIZZIT one. And we pointed that out to the trial court. The simple display of a non-lethal instrument, a taser, or it could have been a pepper spray, or it could have been a bomb. It could have been anything other than a firearm. There are cases about displaying a lethal weapon, a firearm. But that's not what happened here. He displayed a taser. It said back up, back up, back up. And in their view, that means his Fourth Amendment rights have now been affected. We would suggest that's wrong. There's no case on point. Therefore, qualified immunity applies in that instance. You said temper rebuttal, sir. Okay. Mr. Cohen? Good morning, and may it please the court. As the previous discussion just illustrated, jurisdiction always comes first. There is no clear indication that this court lacks jurisdiction to hear this appeal than defendant's argument and defendant's briefing itself. It is a fundamental principle that juries must resolve genuine disputes of material fact, and that a district court's finding of genuineness is unappealable within the context of an interlocutory appeal. I'm sorry. What do we do with the video evidence? Sure. That's the Scott v. Harris case. And the Scott v. Harris case is not a case of jurisdiction. It adds a wrinkle to the well-settled summary judgment standard that the court takes the plaintiff's evidence and facts in the light most favorable to the plaintiff. What if the video overrules the district court's finding that there's a genuine fact issue? Let's talk specifically, I mean, whether she was subdued or not. The video sure looks like she's resisting the whole time. If there's a genuine dispute of material fact, which Judge Vitter points out, whether she's writhing on the ground in pain or whether she's resisting arrest at that point. She has deputy Hart on her back. Her hands are in handcuffs. She's saying, my leg is cramping. Get off my leg. She's in pain. It's at that point she turns onto her back and Officer Hart applies pressure to her throat. They say less than two seconds. I believe it's between the one minute 33 to one minute 38 second mark of the nephew's video where you can see that happening. Not to mention the part that's obscured by Deputy Mooring, who admitted in his deposition that he was intentionally blocking D.J. from reporting the incident. He has a legal question as well as a fact question. Assuming arguendo that she's not subdued in the video, you're saying she is subdued in the video. Assuming arguendo that she's not subdued in the video, what's the answer? So I'll answer that in two parts. One is at the point when Judge Vitter determines that it's a genuine dispute of material fact, this court doesn't have jurisdiction to second guess that determination that there's a genuine dispute of fact. Why doesn't the Supreme Court in Scott B. Harris say that the video is the ultimate, it's the weirdest thing. I teach this in my civil procedure class. Why doesn't, this is the one area where we watch the video and the video beats everything else, if the video is clear. Sure, the court can clearly look to the video and see whether it blatantly contradicts the plaintiff's facts and evidence in this case. Can we, do we have the power to say under Scott B. Harris, this video blankedly contradicts and therefore this case should have been dismissed or qualified immunity should be granted? Hypothetically, the court could, but based on what the defendants argued and it's a deal here, that strips the court of its ability to do that. In the Reyes v. City of Richmond case, the court, the Fifth Circuit said in 2002 to determine whether a denial of summary judgment based on qualified immunity is immediately appealable. This court looks at the legal arguments advanced. Here, the legal arguments advanced go both to the force that was applied to Ms. Perkins or level of resistance when the video is ambiguous and unclear. And that's the Aguirre v. City of San Antonio case. It says when the video is ambiguous, when it supports the plaintiff's version of the facts or when it's incomplete, at that point, Scott B. Harris has no application. But if Aguirre doesn't apply because the video isn't ambiguous, do you lose? We do not lose. I agree under that framework that you're operating under, maybe you wouldn't dismiss and remand, but in that case, you would affirm and remand. The level of force applied by the officers at that point, even if there is some mild level of resistance in terms of writhing on the ground in pain. Flipping over. Flipping over. What's your case that clearly establishes that? So there's a few cases. Trammell v. Frouge, Good v. City of Corpus Christi, and DeVille v. Marcantel all go to the question of whether it's objectively reasonable to apply force to somebody who is not fleeing, not violent, not aggressive, and only resists by pulling away. If the video says that she was aggressive and she was pulling away and she was continuing to resist, assume all those things. Again, assume we see the video that way and that we can override what the district court found. What is your case that says what the officer did at that point was excessive force? They clearly established that, right? Again, that's Trammell. Trammell was a case where the plaintiff did pull away, and here is Officer Hart admitted in his deposition the level of resistance that Ms. Perkins used in this case was, quote, pulling away, turning away. That does not allow an officer to use carte blanche force against someone who they're arresting. He didn't use carte blanche force. It looks like you've expanded a lot here. What the officer did was try to subdue the suspect or the arrestee, and basically, I mean, what I'm getting at, I guess, is this choking allegation. Where's the case that says what the officer did here was excessive? Sure. Under Kennedy v. Weaver, the facts do not have to be materially similar or directly on point. There can be notable factual distinctions. I think it's still clearly established. But they can't be general either. Right. It cannot be abstract, but applying force. You said carte blanche, and that's not what the officer was doing. Fair enough, Your Honor. But applying force to somebody's throat, choking someone, is a significant amount of force similar to in Trammell, where it's knee strikes to get somebody on the ground and subdued and handcuffed. Again, this isn't the only genuine issue of material fact in this case. There's a genuine issue of material fact, even as to what happened before the video started, why Ms. Perkins was initially arrested. The defendants acknowledged that this- What is that material? It goes to two of the grand factors, the severity of the crime and the- OK, and if you want to talk about that, I mean, you could say it doesn't really, what got us there is not relevant. But assuming it is relevant, it seems that the district court's opinion does not talk about the resisting arrest and just is talking about the initial- for the grand factors, does not include resisting arrest, includes only the fact that the initial stop was minor. Yes, and- Without a helmet and some insurance. When you look at the first grand factor, severity of the crime, the case is it's oftentimes resisting is what leads to the confrontation and the struggle, but the court still analyzes the underlying crime, which brought the officers on scene. But that's- Once you're resisting arrest, it doesn't- It's not pertinent anymore that the thing was originally very benign and shouldn't have escalated, is it, under our case law? I disagree with that. Because we're dealing with the act of- OK, give me a case that- What case says that the fact that it started out small and probably should never have escalated, is relevant once you're right smack dab in it and there's a resist and a big scuffle. Sure, for instance, in DeVille v. Markington, the plane at the MAC case was pulled over for going 10 miles an hour over- There is not a scuffle at all in DeVille. I was on that panel. And that's- The person had their window rolling up and down. That's not a scuffle. Right. And it's not a resisting in that sort of way with a violent encounter. Well, in this case, Ms. Perkins was pulling away, as the defendants admit. And so take the Trammell case, which we discussed earlier. There, the court is not looking at the resistance when analyzing the first gram factor. The court analyzes public intoxication, which brought them unseen in the first place. And regardless, it's a distinction without a difference in this case. As both parties agree, the crime which Ms. Perkins was convicted of was a misdemeanor resisting offense. And it's a misdemeanor which would militate against- I'm sure you would agree that officers are allowed to engage in traffic stops. Yes. Right. Those are extraordinarily minimal speeding. I'm not saying they're not safe. They're safe behaviors, but those are also similarly low-level offenses. Yes. So talk to me about what an officer is allowed to do in that scenario when the person who stopped won't comply. I think the expert report of Plano's expert, Roger Clark, a 27-year law enforcement veteran, is relevant to that question. He talks about all the things that a reasonable officer would have done, could have done under the situation here. Let me stipulate that this was not a- this was far from best practices on behalf, with respect to defendants. The question, obviously, is whether this broke some constitutional rule that we're supposed to enforce. Yes. And when the situation as it is here, where Ms. Perkins was- the crime at issue was backpedaling her motorcycle into her driveway without a helmet, which is punishable by a $50 fine, the reasonable practices in that scenario would have been providing her with a citation, which they could have done. They could have waited for the situation to calm down. They could have not dug their knees and elbows into her back and- But they weren't doing that because of the initial infraction. They were doing that because she was resisting arrest. Well, when you look at the facts and evidence as a whole and the entirety of the situation, this isn't a case where the defendants were measured in ascendancy. It was the defendants who escalated this situation. Ms. Perkins was acting calmly from the beginning. She was compliant. She provided her ID, which showed she had no outstanding warrants, that she was at her lawful residence. And when- Herself, because she feared for her safety in this scenario, she asked for a supervisor. She was not on the verge of fleeing here. She did flee, didn't she? She walked off during the encounter. She's supposed to be answering questions and she's not going to go to jail today or whatever the comment was. She's walking off from the- You don't get to walk off even if the reason they're bothering you is a stupid one. And I'm not saying, you know, it's not- Do you know what I'm saying? Why isn't that a fact that we have to take, that she was actually walking off from the encounter? A reasonable jury can certainly disagree with that rendition. How so? Can you help me? Yes, I can help you. If you look at the nephew's video- I looked at the nephew- Tell me where in the nephew's video it refutes that she was walking off or pacing. She paced away from him when they're trying to engage her and she's saying, I'm done. Sure, she's pacing back and forth telling her son and her nephew, you can keep recording. You don't have to go back to the porch. It's at that point when she's pacing back and forth, actually walking towards the officers that Deputy Hart puts down his clipboard and says, that's it. Now you're being placed under arrest. When they come to arrest her, she's continuing to pace and she says, wait, I'm waiting for my insurance to come. I'm waiting for my insurance to come. Much like in DeVille where the plaintiff- But she wasn't waiting for her insurance to come on the thing, that she was not on the phone with anybody about the insurance. By saying that, that's importing a genuine dispute of material fact in this case, which goes back to the jurisdiction point. Importing? Importing a genuine dispute of material fact, which is what the Supreme Court in Toland warned against. And Ms. Perkins was waiting for her insurance company to send proof of insurance so she could provide it to the officers. Then she hands her phone, tries to hand the phone to her son. Those are the facts in evidence under the video, under plaintiff's testimony in her deposition, which support her allegations in this case, in which a reasonable jury- She had this to say, I'm not going to jail today or something of the sort. I do not believe she says that. I think that's plaintiff's allegation of what she said before the video started. Defendants alleged she said, eff y'all, I'm going inside. Plaintiff denied saying that in her deposition. So that's a- That is a fact. It's a genuine dispute of material fact. About whether she said that I'm going inside. That's correct. That's correct. Can you talk about the DJ's claim and whether or not there is a seizure under our case law or the Supreme Court's case law? Sure. I think a seizure starts when somebody feels that they aren't free to leave. From his video and from the nephew's video, you can see two instances when Deputy Mooring gets off Ms. Perkins and approaches him and shoves him back two times. I think it's the 111 and 115 mark of his video. You can see him being pushed back. Is that the seizure? That's the seizure. He doesn't- He was not- He wasn't- Well, he was certainly free to leave because the officer was trying to get him to leave. Yes. I disagree with the premise because when an officer is in your face pushing you back and then has a taser in your face, I think that that constitutes a seizure under the law. Oh, great. What case says that? Yes. Those cases, it was not an issue that was briefed or argued on the lower court or in the defendant's appeal here. Yeah, but you've got the burden of showing the case that clearly establishes that what the officer did was assume there's a Fourth Amendment seizure. What's your case that shows what he did was excessive? I do not have that case on hand now, but we can supplement that. Does it make any sense? Are you saying that every time an officer wants to establish a perimeter, which is essentially what was going on here, that's a seizure? Under the circumstances- I want to be in this square footage. No, I need you basically anywhere else on the planet, but this area. When the officer is approaching the individual and actually uses physical force on that individual- I get that and then pulling out the taser, but the question is what was that in service of? Was it in the service of detaining him or was it in service of establishing a perimeter? In fairness, isn't it pretty obvious that the officer was trying to establish some space to perform the arrest? That's what the defendants allege here. It was wholly unnecessary under the circumstances where DJ was an innocent bystander. He was called out by his mother to record the incident. And it's his courage in doing that which shows why Turner v. Driver is important. No, there's no question of the right at least in my mind of the right to film. The question is the right to film in that level of proximity when it's an inherently unstable, potentially violent situation. Right. DJ in this instance was at- He could have done it three feet back, six feet back. That's all I'm trying to say. From my view of the video, and I believe from a reasonable juror's view of the video, he's standing on the sidewalk on the end of his driveway close to the porch. He's not approaching the officers or moving onto the scene. He's barefoot. It's in broad daylight as Deputy Mooring admitted in his deposition. He didn't pose a reasonable, reasonably credible threat at that point. And he's just filming, trying to film what is happening with the police, which was his First Amendment constitutional right to do. Was he not the one screaming? Was that the other person? I'm saying you're hurting this woman. He says, that's my mom. But no, but the part about hurting and- I think you're choking the lady. Yeah, you're choking the lady. That was his nephew. So that's not him? It's the nephew that said that? Yeah. And I would push back a little bit  of it as this individual screaming. Well, no, the yelling at the officer. I'm not saying that you can't yell at an officer. It's no insinuation of the question. I'm just trying to determine whether that was him or the nephew. And they're telling me that's the nephew. That was my question. I believe it was Ms. Perkins' nephew who said- Would you agree to the characterization that both sides of this dispute were engaged in escalation? Both sides may have been. I'm not saying that as, you know, what the legal implication of that. That, for what it's worth, I find this a close case precisely because both sides are behaving very badly. Yes, I wouldn't concede that point completely. I agree that the officers escalated it by resorting to profanities. I agree the officers could handle this much better. The question is, what about the citizen? The citizen was in a situation- Many citizens would simply stand there and answer the questions. And I presume the officers would not have become agitated. The officers should have become agitated. I agree with that. But frankly, neither should the citizen. Ms. Perkins eventually did become upset and agitated, as is visible on the video. But keep in mind that- I think it's from the first second of the video. Right. But keep in mind that the video doesn't start at the beginning of the officer's interaction with Ms. Perkins. And there's other evidence in the record that Ms. Perkins was compliant at the outset by providing her identification and answering the- I'm sorry. There's evidence you said in the video? Or you're saying before the video? In the record. In the record. Not in the video. Not the video. Outside of it, before the video. Your point is we're allowed to- not allowed, but required to entertain that potential fact pattern. Right. And again, I go back to the- Your theory is that it was all officer escalation and then eventually she got angry because- Yes. And I go back to the fact that Ms. Perkins called 911 in this case to request a supervisor because she feared for her own safety and she needed help in this situation. There's no evidence that- or there's at least a genuine issue of material fact that she presented no threat. Was she fearing her own safety when she called the officer weak and laughed at him? She was worked up, I believe. Was she fearing her safety at that point? Was she fearing her- Yes, she has two officers. That's not what the video shows. Don't try to defend that. I'm not saying it matters, but the reality is she was taunting and she was doing her own share of resisting. The video shows that pretty conclusively. I'm not sure that matters, but again, you overstate things. It doesn't help you. I appreciate that. I appreciate that. Hey, assuming that it was not argued whether there was a seizure or not, certainly it was argued about whether there was excessive force against the son. Yes, and- So what case says standing with the taser is using excessive force? Sure. And we're not talking about anything about the videoing. The videoing is okay. You can video the police. So that's not the issue. The issue is what about holding the taser and saying stay back is excessive force under our case law. The Flores v. Rebus case, which we cite to, it's a district court opinion out of the Western District of Texas. That can't be clearly established law. I agree. So do you have clearly established law or do you lose on his claim? No, we do not lose on this claim. As I was going to say, that case refers to an out-of-circuit consensus where seven circuits have denied qualified immunity to officers alleged to have brandished a firearm. That can't be clearly established law either, can it? It has to be in our circuit or Supreme Court, doesn't it? I believe a robust consensus of persuasive authority concern is clearly established. What case says that? I believe that's in Kokesh makes that point that it's either controlling authority or a robust consensus of persuasive authority. It says holding a taser but not using it is excessive force. Those cases apply to brandishing a firearm without using it as opposed to a taser. This is a non-lethal weapon and it's being held up. The damage to the individual is still the same in this case. What case? So there's no case in all the whole country that says holding a taser up is clearly established as a violation of the excessive force. Is that what you're saying? That is correct, Your Honor. Okay. But the one thing if my time is up, there's one point I'd like to add if I may. Okay, sure. It's not only the brandishing of the taser that was excessive force that was used against D.J. It was also the shoving and I would refer to the Sam B. Richard case out of this circuit where the court found that it was error for the district court to conclude that de minimis injuries couldn't support an excessive force claim. And the language referred to that is, I believe, pushing, kneeing, and slapping. And it's that pushing that... I assume you would agree that the officers allowed to establish a perimeter of some kind? Yes, reasonable time, manner, and place. So the dispute is basically how much space is necessary. Right, which is another genuine... How much space do you think is necessary? I will... Actually, let me rephrase. How much space was... How close was D.J. to the arrest? I would say the majority... The video, it's quite close. It's... For the majority of the time, he's obviously very close when he's receiving the phone from Ms. Perkins at that part of the arrest. I'd say about six feet would be my estimate, but it's hard to tell. At this point, I think it's a question for a jury to resolve whether it was reasonable the restrictions they were placing on D.J.'s constitutional right at that point. He and the nephew were upset about the mother's treatment. And unfortunately, Toland v. Cotton itself is an example of where somebody's, don't harm my mother, and there's a lunge, and then there's a terrible, terrible tragedy in that case, although that case was pursued. So there's certainly the point that people often interfere with their mother's arrests or treatment by the police, that that's a common scenario because it's human nature to protect your family, especially your mom. I appreciate that, Your Honor, but I would emphasize there was no sudden movements or jumps into this. Okay, so are you saying the two pushes are clearly established as being excessive force in our circuit? Understandably, Your Honor. Okay. Thank you. I've got a dovetail on that last question because I think I can help the court with this issue at least. What is an acceptable perimeter? I will tell you that when it comes to bladed weapons, the Supreme Court and the circuits throughout this country have found 21 feet. That's the national standard. Why is that important? Because the courts have recognized that an individual can close the distance in 21 feet with a deadly weapon in their hand before an officer can react and respond to that deadly threat. Can you kind of stay up at the podium so they can get you recorded? I'm sorry. My apologies. I kind of get animated. Thank you. All right. Try not to get animated. Exactly. So 21 feet. That's a standard. If you want to talk about standards, what is an acceptable perimeter? Well, that's a number that has some meaning because the courts have recognized that a human being can close that distance in 21 feet and get on an officer and basically put their life at risk. So if we're talking about 21 feet, is that the right number? I don't know. But there's no case that says either way. So qualified immunity by definition should attach and that should be the end of this discussion. With regard to DJs. I'm sorry, this may be helpful. What is this policy that you're referring to in terms of 21 feet? Well, I had a case in this circuit. I don't think it... I can't remember if it got appealed or not. It might have been at the district court level. Well, you said you were invoking a national standard. That is a national standard. It's for the use of deadly force when someone has a bladed weapon in their hand because the courts have recognized in the 9th Circuit, the U.S. Supreme Court, lots of different circuits have said that's that 21 feet is the amount of time it needs to be 21 feet or less. Oh, I see. But there's no bladed weapon. I understand that. And I'm not trying to confuse you. I'm simply saying that courts have looked at that. That's the zone of danger is what you're saying. That's where it's dangerous because a human being can close the distance of 21 feet before an officer can respond and react to that threat. That's the only reason I'm bringing that up. So clearly in this case, this individual was well within 21 feet. So could he have closed that distance and jumped on the back of one of those officers and started struggling with him for his firearm to try to defend his brother? Absolutely. And what do you see on the video? You see my deputy saying, back up, dude. Back up, dude. Back up, dude. He's telling them that so that he will do that. What is use of force? It starts with verbal commands. It's a spectrum. So what happened here is our deputy said, ma'am, you're under arrest. I'm telling you what was about to happen to you. She starts resisting. They used what is, whereas we have a Bueller measured and ascending. That's exactly what happened in every instance in this case. Measured and ascending. Back up, dude. Back up, dude. OK, you're not listening to me. Now I'm going to stand up and I'm going to put myself in between you and this arrest. And at some point that wasn't working. So he displayed his taser measured and ascending. I have a question about the video evidence. One of the videos or just acceleration of the video at the beginning. Can I assume correctly that you've gotten all the discovery that you need in the case? That's all that we got. All the video that's available. Both videos have been as low as to you because these are the plaintiff's videos. This was about a year before our department adopted body cams. So this will probably be the last case you guys have from us where we don't have our own video. Thankfully, so we're actually in terms of why it was accelerated or what happened in the time period. For some reason, we don't have a video. What I'm told was that they did that so they could send it and they lost the original. So I don't know where the original is. I don't know if it still exists. But you take it as you get it. You take it as you get it and you can make let me get. You said that there was a third video and I thought there were just two. Those two. There's also it's the problem is it's not in the record with a number, but it's we confirmed it's in the record. OK, so subsequent to the filing of our summary judgment, both sides agreed that there was a third video from a neighbor, which shows which was from the side yard, which shows the side vantage point of where DJ was with respect to the officer. We agreed that we're going to put this in evidence subsequent to the summary judgment being filed and it's in there. We filed a motion to supplement the record because we thought it wasn't. The clerk said, no, no, it's in the record. It's there. And then the court said, OK, based on that, we're going to deny your motion to submit. So it's in there. We called. They told us it's there, but it doesn't have a number. But it's physically there's a video. A third video. It's in the appellate record. In the appellate record. I do have one question. At the beginning of the video, all we know is both sides are agitated. She's starting to walk away. Why was it? Why was it necessary to arrest? Because you leave at that point, she's leaving the traffic stop before she had been given her summons. But in fairness, literally, I think both sides are unnecessarily overstating what we can obviously see from the video. Let's not overstate. All she's doing is walking backwards. I think it's like one or two steps. At the time that the officer announced that he's going to arrest her. I'm just asking a straight question. You shouldn't assume this is friendly or hostile. Why was it necessary? I get that she wasn't standing still. I get that she was being very aggravated. I'm just simply asking. She wasn't running away. She wasn't announcing that she was going to be physically dangerous. She just is obviously annoyed and turns around and walks one step away. Why is that moment justified arrest as opposed to continued conversation? Well, I'm just asking. The conversation ended when she walked away from the custodial stop. You don't get to tell the police officer. So is your position, is your position, again, let me just ask, is your position that any time during a temporary stop, a custodial stop, not arrest, but just a brief stop, any time a citizen takes one step away, the officer has a legal right to arrest? And I may be right or wrong. I want to ask what your legal view is. That's enough? If she did what I've been doing all morning, which is take a step back like this. No, I don't think we'd be talking. We wouldn't have this case right now. But when she goes there. Yeah, I think so. I think that's at that point, you're leaving my stop. Why didn't he say, I mean, I guess we could second guess all day long, but he didn't say, hey, come back. I want to give you this citation. I don't want to have to arrest you. Well, ma'am, I don't. I'm just asking. I'm not saying this is legally required. I'm just trying to probe that. Now we're doing exactly what the courts have said not to do in qualified immunity, which is the Monday morning court event. Why didn't you do this? You could have done that. I am nevertheless allowed to ask you the question. I'm going to ask you that question. Could the officer had simply said, ma'am, I need you to stop moving. I need to be able to talk to you. Otherwise, I will have to arrest you and I don't want to do that. Why would that ought to be a less non escalating, non aggravating way of handling the situation? And if I put my client on the stand right now, he would tell you what you saw there was the end point of a long, agitated, angry conversation where they were being accused of being racist and everything else. Your point that the officers had essentially already delivered that. Yes. Why isn't that a fact dispute? I mean, that's what a trial will allow you to. Because unfortunately, we don't have that video. And that's the one thing I haven't really gotten a chance to discuss, which is heck, right? We don't need to get into this. Well, why did you arrest her? Maybe you should have done this. She got arrested and she was convicted of resisting arrest. Whether or not it was a good arrest and should have done, should not look that's over your review standard. You don't get to decide whether or not they should have done something different when they arrested her. Maybe you should have just talked her into taking the citation instead of arresting her. The fact is she got arrested. She was convicted. End of story. And the district court completely got heck wrong. She used ARD, which talks about and then distinguished from Bush v. String, which Bush v. String talks about heck only applies when heck doesn't apply when you have a excessive force that's separate from the arrest. I take you to the jail and then I beat you up. It's finding heck is about not using this device to question the validity of a criminal conviction. Correct. The resistance. Is it necessarily questioning the conviction to say that the officer also mishandled the situation? Yes, it is. Because if the claim is... Both sides can mishandle it. Well, that's your opinion, Judge. I would take... I'm just trying to understand the lawyer. Isn't it possible that both things are true? That the officer behaved improperly and excessively prior to the arrest and that the arrest was valid? And that the person was resisting arrest? I don't think once you have a criminal conviction in state court of resisting arrest, we ever get to that second question, whether the officer should or should not have done that. Maybe the arrest could have been handled differently. I don't think you get to even go there. The criminal conviction forecloses any second guessing. Once you've got it, the valid resisting arrest, the whole thing is shielded from our review. And the judge, District Court, with all due respect, got it completely wrong. What's your best case for that? Just that one rule. Starts with heck. And then looking at the case she cited, which is Ard, and which cited Bush v. Strang. And look at how those cases are distinguishable. Judge Vitter is a great judge and I'm sure she's a very nice person, but she didn't really... Just look at those two cases to figure out what's really going on here with respect to this case. You cannot sit there and say, well, maybe this is... I can find an excessive force, even though someone is convicted of resisting arrest, which means if I say there was excessive force, you're invalidating the resistance. That's what heck says. And all the cases that kind of come from there. And the only distinction is when the force is distinct from the arrest. After you're arrested, now I'm going to exact some revenge on you physically. That's obviously didn't happen here. Last point I have to make, because you asked this question, I have to just give you the answer. Carswell v. Camp is your decision from 20... Not you personally, but... I know Carswell v. Camp. Thank you so much, counsel. Thank you very much. Y'all have a good day. And this case is submitted and the court will stand in recess. Actually, it will stand adjourned pursuant to the usual order. Thank you. Thank you, Your Honors.